UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE the application of VERONICA LUZ MALAVER AVENDANO, | * * * * | |
| Plaintiff/Petitioner, | * * | |
| v. | * * | Civil Action No. 19-cv-10660-ADB |
| LEONARDO ALFONZO BLANCO BALZA, | * * * | |
| Defendant/Respondent. | * * | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BURROUGHS, D.J.

## I.    INTRODUCTION

Petitioner Veronica Luz Malaver Avendano ("Avendano") filed a petition for the return of her eleven-year-old son, G*,[1] to Margarita Island, Venezuela, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention"), as implemented by the United States by the International Child Abduction Remedies Act ("ICARA"). [ECF No. 1]. G*'s father, Respondent Leonardo Alfonzo Blanco Balza ("Balza"), with whom G* is currently living in Medford, Massachusetts, argues, first, that the child is mature enough to warrant the Court considering his desire to stay here and, second, that Venezuela poses a grave risk of harm to G* given the current political and economic circumstances. [ECF No. 7].

---

[1] To protect the child's privacy, the Court refers to the child as "G*."

II.    **PROCEDURAL HISTORY**

Avendano filed her petition on April 7, 2019.  [ECF No. 1].  Balza answered on May 13, 2019, [ECF No. 7], and, after securing counsel, filed an amended answer on June 11, 2019, [ECF No. 17].  The Court appointed a *Guardian ad Litem* on October 28, 2019.  [ECF No. 27].  On November 1, 2019, Avendano filed a motion *in limine* opposing G*'s participation in the proceeding.  [ECF No. 28].  The Court denied the motion and the case proceeded to trial.  [ECF No. 33].  From December 10 through December 13, 2019, the Court heard testimony from Avendano, Balza, the *Guardian ad Litem*, three expert witnesses, and a number of residents of Margarita Island, Venezuela, including Avendano's employer and her lawyer in Venezuela, as well as G*'s school principal, dentist, and doctor.  [ECF Nos. 39, 40, 45, 46].  The Court also met with the child on December 11, 2019, at the *Guardian ad Litem*'s offices.[2]  [ECF No. 41 ("12/11 Interview Tr.")].

The Court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

III.    **THE HAGUE CONVENTION**

Over one hundred countries—including both the United States and Venezuela—have signed the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.  See Status Table, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last accessed February 19, 2020).  Those countries "desir[e] to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return

_____

[2] The Court was accompanied by a court reporter and the parties were provided with a transcript of the meeting on that same day.  [ECF No. 41].

to the State of their habitual residence, as well as to secure protection for rights of access . . . ." Hague Convention pmbl. "Broadly speaking, the Convention aims to deter parents from abducting their children to a country whose courts might side with them in a custody battle." Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 305 (1st Cir. 2019).

Under the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*, which implemented the Hague Convention, "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." Id. § 9003(b). The purpose is to "restore the pre-removal status quo and discourage a parent from crossing international borders in search of a more sympathetic forum." Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000).

The Convention does not empower the Court to make any determinations regarding child custody. 22 U.S.C. § 9001(b)(4). The Court is tasked solely with determining whether that custody decision should be made here in the United States or by G*'s country of habitual residence, Venezuela. See id. "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest." Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015). Therefore, "children who have been wrongfully removed from their country of habitual residence must be returned, unless the abductor can prove one of the defenses allowed by the Convention." Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002).

Generally, a petitioner must demonstrate that she "(1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." Id. (citing Hague Convention, art. 3). In this case, Balza does not contest that Avendano has satisfied the requirements of the *prima facie* case. [ECF No. 36 at 11]. Instead, Balza invokes two exceptions to the Hague Convention's general rule. Balza claims, first, that G* is a mature child and that it is therefore appropriate for the Court to consider his stated desire to stay with his father in the United States, [id. at 11], and, second, that returning G* to Venezuela would pose a "grave risk" of harm, [id. at 12].

IV. **FINDINGS OF FACT**

A. **The Parents' Early Relationship**

Avendano, a citizen of Venezuela, and Balza, a dual citizen of the United States and Venezuela, first met in Boston, Massachusetts, in 2006. [ECF No. 32 at 4]. The two had a sporadic romantic relationship over the next few years, with Avendano living with family in Boston at times and Balza spending summers in Venezuela. [ECF No. 40, 12/11 Tr., Balza Testimony]. The two agreed that they would not get married and eventually separated. [Id.]. In July 2007, shortly after the relationship ended, Avendano informed Balza that she was pregnant. [Id.]. Balza traveled to Venezuela three times to visit Avendano during her pregnancy. [Id.]. The child, G*, was born on March 10, 2008. [ECF No. 32 at 4].

B. **The Child's Life in Venezuela**

G* was originally raised in Venezuela's capital, Caracas, although he moved five times in the four years before he and his mother eventually moved to their mountain home on Margarita Island. [ECF No. 40, 12/11 Tr., Balza Testimony]. G* spoke very fondly of his time living with his mother in Venezuela. [12/11 Interview Tr.]. He happily talked about his family's

farm with its mango trees, lemon trees, and large field where he would walk his three dogs. [Id.; ECF No. 39, 12/10 Tr., Darsney Testimony]. All of the witnesses testified to G*'s happy disposition and his ability to make friends in any circumstances. [ECF Nos. 39, 40, 45, 46]. In general, he views his life with his mother in Venezuela very positively, [12/11 Interview Tr.], and this perception was validated by witness testimony, [ECF No. 39, 12/10 Tr., Darsney Testimony; ECF No. 40, 12/11 Tr., Balza Testimony; ECF No. 46, 12/13 Tr., Avendano Testimony]. There is no question in the mind of the Court that Avendano is a loving and committed parent.

That being said, G* has other memories of Venezuela that are less positive and more reflective of the political and economic situation in that country. G* also remembers his classes being consolidated because so many teachers were leaving. [ECF No. 39, 12/10 Tr.; 12/11 Interview Tr. at 21–22]. He described seeing a fair number of poor people living on the streets near his home. [ECF No. 39, 12/10 Tr., Darnsey Testimony; 12/11 Interview Tr. at 21–22]. He talked about having to boil water for hot showers, though he usually decided not to, because it took too much work, [12/11 Interview Tr. at 28], and said that his house sometimes lost power, which scared G*, [id.]. He knows that two of his best friends have since moved away from Venezuela because of the country's economic and political crisis. [12/11 Interview Tr. at 11]. Because of the frequent moves prior to living on Margarita Island, he was rarely in the same school for two consecutive years. [ECF No. 39, 12/10 Tr., Darsney Testimony].

Balza traveled to Venezuela often during the first nine years of G*'s life to see G* and visit with his own family, as he still has siblings and another child in Venezuela. [ECF No. 40, 12/11 Tr., Balza Testimony]. Balza provided financial support, including paying for G*'s health care and private school tuition. [Id.; Trial Ex. 20]. When G* was two, he traveled to the United

States for the first time with Avendano to visit Balza in Medford. [ECF No. 40, 12/11 Tr., Balza Testimony].

Over time, the co-parenting relationship between Avendano and Balza worsened. Balza claims that Avendano purposefully obstructed his access to G*. [ECF No. 40, 12/11 Tr., Balza Testimony]. He alleges that in 2015 she purposefully planned a trip with G* so that G* would be unavailable for the entirety of his scheduled visit with his father in Venezuela. [Id.]. G* himself thinks his mother sometimes hid the fact that his father was trying to call him. [12/11 Interview Tr. at 29]. He used to hope that his parents would get back together, but now understands that his parents don't like each other. [Id. at 32].

At some point the relationship deteriorated to the point where the parties sought court orders to enforce visits. In October 2016, a Venezuelan court entered a visitation order which provided that G* would stay with Balza in the United States every year from August 1 through August 30. [ECF No. 32 at 4]. Additionally, every other year, G* would stay with Balza from December 17 until January 3. [Id.]. In December 2016, Avendano refused to provide authorization for G*'s first ordered visit. [ECF No. 40, 12/11 Tr., Balza Testimony]. Balza once again had to resort to the Venezuelan court system in order to enforce the visitation order, so that G* could visit him in Massachusetts. [Id.].

### C. The August 2018 Visit

In July 2018, Balza arrived in Venezuela to collect G* for their annual summer visit. [ECF No. 40, 12/11 Tr., Balza Testimony]. Balza had purchased a round trip ticket for G* and planned to bring him back to Venezuela himself, as he often did when visiting his family. [Id.]. Balza claims that Avendano agreed to extend the visit from July 20 until September 2, 2018. [Id.]. When Balza arrived on Margarita Island, however, Avendano and G* were not there.

[Id.].  When he did find them three days later, Avendano refused to sign the July 20 travel authorization.  [Id.].  She then refused to authorize the August 1 travel to Massachusetts, which was the date mandated by the October 2016 visitation order.  [Id.].

On August 8, 2018, a Venezuelan court issued an enforced execution of the October 2016 visitation order, which authorized G* to stay with Balza from August 9 until October 6, 2018. [Id.].  According to G*, when his father came to pick him up, Avendano would not let Balza past the gate to their neighborhood, [12/11 Interview Tr. at 25], and then upset G* by insulting Balza and trying to prevent G* from leaving the house, [id.].

At that time, both G* and Balza intended that G* would return to Venezuela after their scheduled visit, [ECF No. 46, 12/13 Tr., Avendano Testimony], and Balza had already purchased tickets for their return flight, [ECF No. 40, 12/11 Tr., Balza Testimony].  Avendano claims that during the visit Balza limited her access to G* and blocked her phone for three months.  [ECF No. 46, 12/13 Tr., Avendano Testimony].  When she was next able to speak to her son, he told her that he wanted to stay with his father in the United States.  [Id.].

On September 10, 2018, G* became a citizen of the United States.  [ECF No. 32 at 4; Trial Ex. 2].  At that point, the government took his green card and informed Balza that G* would need a U.S. passport.  [ECF No. 40, 12/11 Tr., Balza Testimony].  Because securing a passport would require both parents' authorization, Balza reached out to Avendano and requested that she approve G*'s passport.  [Id.].  She refused to authorize the passport and said that G* could wait until he was back in Venezuela and then get a passport at the U.S. Embassy in Caracas.  [Trial Ex. 61 at 3 ("GAL Report")].  That embassy has since closed.  [Id.].  If Balza had returned G* to Venezuela without his U.S. Passport, G* would likely not have been able to return to the United States.  Balza sought to extend the visit on September 25, 2018, to give him

additional time to secure a U.S. passport for G*, but the Venezuelan court denied the request. [ECF No. 32 at 4].

Balza refused to send G* back to Venezuela without a passport that would allow him to travel back to the U.S. [ECF No. 40, 12/11 Tr., Balza Testimony], and Avendano continued to refuse to authorize the passport, [id.].

### D. The Child's Life in Massachusetts

Since August 2018, G* has lived with Balza in Medford, Massachusetts. He started fifth grade in Medford in the fall of 2018, unable to speak English. [ECF No. 40, 12/11 Tr., Balza Testimony]. By the end of the school year, he was fluent and received an award for his success in learning English as a second language. [ECF No. 40, 12/11 Tr., Balza Testimony; Trial Ex. 13]. He is now in sixth grade and enjoying the transition to middle school. [12/11 Interview Tr. at 9]. In addition to school, he likes karate and his art classes. [ECF No. 40, 12/11 Tr., Balza Testimony; ECF No. 45, 12/12 Tr., Nguyen Testimony].

G* has consistently maintained to the *Guardian ad Litem*, Balza's expert Dr. Christine Darsney, the Court, and both of his parents that he likes living with his father and wants to remain in the U.S. [12/11 Interview Tr. at 18]. After moving around so much as a younger child, he reports finally feeling settled and now thinks of Massachusetts as home. [ECF No. 39, 12/10 Tr., Darsney Testimony; 12/11 Interview Tr. at 20]. He used to avoid speaking with his mother, because they would often fight about him wanting to stay in the United States. He now makes an effort to talk to her every Friday and to return her calls. [12/11 Interview Tr. at 12]. If he forgets, Balza reminds him to call his mother. [Id.]. Still, he sometimes gets overwhelmed by talking to his mother, [id.], and tries not to talk to her about this proceeding and his desire to stay

in Massachusetts, because the conversation is frequently so upsetting, [id. at 19]. He feels like he can call his mother whenever he wants. [Id. at 12].

G* misses Venezuela and clearly loves his mother. He is, as Balza said, a proud Venezuelan. [ECF No. 40, 12/11 Tr., Balza Testimony]. He frequently calls and texts with his friends back in Venezuela, though some of them have moved away. [12/11 Interview Tr. at 10–11]. When G* is homesick, his grandmother, who lives close to Balza's home in Medford, will make him his favorite Venezuelan food. [ECF No. 40, 12/11 Tr., Balza Testimony].

E.    The Child's Stated Desires

It is undisputed that G* wants to stay with his father in Massachusetts. Since deciding that he wanted to remain in the United States, he has seemingly not waivered in his decision.

On December 10, 2019, the Court heard testimony from Christine Darsney, Ph.D. ("Dr. Darsney"), a staff psychologist with the Child Cognitive Behavioral Therapy Program at Massachusetts General Hospital and the Director of the hospital's Children and the Law Program. [ECF No. 39, 12/10 Tr., Darsney Testimony]. Dr. Darsney was retained by Balza to assess whether G* qualifies as a mature child for purposes of the Hague Convention. [Id.]. She has performed over 500 of these evaluations and supervised additional evaluations for post-doctoral fellows and child psychology residents. [Id.]. She has also acted as a *Guardian ad Litem* in other cases. [Id.]. In determining whether G* is a mature child, Dr. Darsney evaluated his cognitive and developmental functioning, his understanding of the court proceedings and the role of the attorneys, his ability to describe and distinguish between a truth and a lie, his relationships with both of his parents, his understanding that people, including his parents, have their own thoughts and feelings, and whether any of his stated preferences were the result of coaching. [Id.]. She met with G* on multiple occasions between August 2019 and November

2019.  [Id.].  She found him easy to interview and was struck by how positively he spoke about

his time in Venezuela.  [Id.].  His only complaint about his relationship with his mother

concerned the parental conflict at issue in this case.  [Id.].

Dr. Darsney found that G* is a mature child for purposes of these proceedings, because

he spoke very positively about his life with his mother in Venezuela, but explained why he

would rather stay with his father in Massachusetts.  [Id.].  Additionally, G* understood the

purpose of these proceedings, including the role of an attorney, and had also participated in other

proceedings in Venezuela.  [Id.].  Finally, Dr. Darsney testified that G*'s concerns with going

back to Venezuela, given the socioeconomic and political climate there, seemed to be rooted in

his own experience and did not evidence any inappropriate influence from his father.  [Id.].

The Court also heard testimony from Dr. Dante Spetter, a licensed psychologist and

*Guardian ad Litem* appointed by the Court in this case to determine whether it would be

beneficial or detrimental for G* to testify in this proceeding.  [ECF No. 45, 12/12 Tr., Spetter

Testimony].  Dr. Spetter spoke with both parents and met with G* for roughly an hour, although

the parties dispute the exact length of the meeting.  [GAL Report at 2; ECF No. 40, 12/11 Tr.,

Balza Testimony].  During his session with Dr. Spetter, G* reiterated that he wanted to stay with

his father.  [GAL Report at 12].  He told Dr. Spetter that it was "fair" that he live with his father

now, because he has lived with his mother for most of his life.  [Id. at 12].  Dr. Spetter believes

that G* simply wants these court proceedings to end.  [Id. at 12–13].  Her eventual conclusion

was that "[t]he Court should protect this child from being further drawn into his parents' conflict

and should take any appropriate steps to maximize access to both parents."  [Id. at 14].  Both Dr.

Spetter and Dr. Darsney agreed that it was possible that G* would act out if he were returned to

Venezuela against his wishes. [ECF No. 39, 12/10 Tr., Darsney Testimony; ECF No. 45, 12/12 Tr., Spetter Testimony].

During the trial, the Court met with G* in Dr. Spetter's office on December 11, 2019. [12/11 Interview Tr.]. With the parties' agreement, and to minimize G*'s exposure to these proceedings, neither party was present but they were provided with a transcript of the interview that same day. G*'s ideal scenario would be to live with his father for now, but to be able to travel back and forth to see his mother without having to worry about either parent impeding his ability to come and go. [Id. at 19–20].

He also told the Court that he thinks that he is old enough to decide where he wants to live. [Id. at 18]. He is frustrated that his parents keep getting involved in legal proceedings and just wants to feel settled, without worrying that a court will decide he has to move back to Venezuela. [Id. at 29]. Avendano has told him that he is too young to make that decision. [Id. at 18; ECF No. 46, 12/13 Tr., Avendano Testimony]. Though he has previously felt like he was being pulled back and forth by his parents and actually felt pressured to say what they wanted to hear and to be on one side or the other, he now sees himself as being on his own side and trying to determine what he wants and what is best for him. [12/11 Interview Tr. at 23]. He told the Court that he would feel relieved if he were allowed to stay with his father in the United States and did not want to think about what it would be like if he had to move back to Venezuela. [Id. at 29–30].

G* understands that his mother misses him, but he is often overwhelmed by her frequent calls and texts. [GAL Report at 11; ECF No. 39, 12/10 Tr., Darsney Testimony; 12/11 Interview Tr. at 12]. He wishes that he could just tell her that he wants to stay in the United States and that she would be happy for him. [12/11 Interview Tr. at 19]. In a perfect world, she would even

visit him in Massachusetts while he lived with his father.  [Id.].  His father has told him that he can go back to Venezuela whenever he wants and G* believes that his father will let him travel back to Venezuela for visits or permanently if that is what G* decides he wants.  [Id. at 24].  He worries that if he is in Venezuela, his mother won't let him return to the United States to live with or spend time with his father.  [Id.].

## F.    The Current State of Venezuela

Venezuela is currently experiencing a period of economic instability and political unrest, which is well documented.  Articles have been written about Venezuela, discussing the high rate of child starvation, [Trial Exs. 24A, 24B], its failing water system, [Trial Ex. 24C], ineffective health care system, [Trial Exs. 24D, 24I], collapsing electrical infrastructure, [Trial Ex. 24L, 24N, 24Z], and the resulting refugee crisis, [Trial Exs. 24E, 24F, 24K, 24S, 24W].

Balza presented testimony from two expert witnesses who described the current political and socioeconomic climate in Venezuela.  Benigno Alarcón is the Director of the Center for Political Studies at Andrés Bello Catholic University in Caracas.  [ECF No. 39, 12/10 Tr., Alarcón Testimony].  His research focuses on Venezuela's social, economic, and political conditions.  [Id.].  He described a failed state in the midst of a humanitarian crisis, including a corrupt government, a food shortage, an ineffective judicial system, the failure of public utilities, and a high rate of violence.  [Id.].  He testified that Venezuela has been under the rule of an authoritarian regime since Hugo Chavéz died in 2013.  [Id.].  The hallmarks of that authoritarian regime include a lack of checks and balances, with the government controlling the judiciary and refusing to acknowledge the validity of the legislative branch.  [Id.].  That political unrest has coincided with the country's failing economy and hyperinflation.  [Id.].  In January 2019, one U.S. dollar was equal to roughly 800 bolivars.  [Id.].  By the time of Alarcón's testimony, the

exchange rate was roughly 45,000 bolivars to one dollar.  [Id.].  Alarcón estimates that roughly

80% of Venezuelan citizens cannot get the food they need.  [Id.].  Some Venezuelans are able to

purchase international health insurance, but there is otherwise no public health care system.

[Id.].  Doctors have fled the country due to the inflation and a lack of medical supplies.  [Id.].

Patients are asked to provide their own medical supplies and medications.  [Id.].  The country is

incredibly dangerous, with Caracas having one of the highest murder rates in the world.  [Id.].

Alarcón further testified that the court system is similarly failing.  [Id.].  Litigants must pay

administrators to ensure that their case is considered.  [Id.].  Since 2013, over four million people

have fled the country.  [Id.].

Similarly, Dexcy Alberto Guedez Gonzalez, a journalist working on Margarita Island,

testified about his knowledge of challenges on the island, including failing public services,

education, healthcare, and transportation.  [ECF No. 40, 12/11 Tr., Gonzalez Testimony].

Gonzalez originally worked for Sol de Margarita, one of the most prominent news sources on

Margarita Island.  [Id.].  He claims that he left because the newspaper was acting as a

propaganda mouthpiece for the regime.  [Id.].  According to Gonzalez, the government has

detained individuals for speaking out about the country's failing conditions.  [Id.].  His testimony

is supported by the United Nations Human Rights Council, which found that "[o]ver the past

years, the [Venezuelan] Government has attempted to impose a communicational hegemony by

enforcing its own version of events and creating an environment that curtails independent

media."  [Trial Ex. 21 at 6].

Gonzalez's testimony, which focused on the current state of Margarita Island,

corroborated Alarcón's description of the situation in Venezuela more generally.  He talked

about a black market for food which has developed to address food scarcity.  [Id.].  Additionally,

the island's health care infrastructure is deteriorating. The problems with the island's one public hospital, which was declared to be in a state of emergency in 2017 by Venezuela's Society of Medical Specialists, [Trial Ex. 23A], are well documented. The hospital's intensive care unit was reported as being closed for 15 days because of a lack of medical supplies. [Trial Ex. 23B]. Gonzalez described cancer patients protesting because they have not received chemotherapy in over two years. [ECF No. 40, 12/11 Tr., Gonzalez Testimony]. Additionally, because of a gas shortage, families have resorted to cooking with wood which has resulted in children dying in house fires. [Id.]. Likewise, there is a water shortage, because saltwater has seeped into the island's public water supply. [Id.].

On April 9, 2019, the U.S. State Department issued a Level 4 Travel Advisory, the highest advisory level issued by the Department, [Trial Ex. 4 at 2], that warned, "Do not travel to Venezuela due to crime, civil unrest, poor health infrastructure, kidnapping, and arbitrary arrest and detention of U.S. citizens." [Trial Ex. 3 at 1 (emphasis in original)]. According to the State Department's 2019 Crime and Safety Report for Venezuela, "[t]he Government of Venezuela often attempts to refute claims of high crime and murder rates; however, independent observers widely reject such claims." [Trial Ex. 11 at 1]. The advisory noted that "[v]iolent crime, such as homicide, armed robbery, kidnapping, and carjacking, is common," and that "[t]here are shortages of food, electricity, water, medicine, and medical supplies throughout much of Venezuela." [Trial Ex. 3 at 1]. For context, Level 4 Advisories have also been issued for travel to countries such as Syria, Somalia, Afghanistan, North Korea, Iraq, Yemen, South Sudan, Mali, Libya, Iran, and the Central African Republic. [Trial Ex. 5 at 1–2]. Similarly, the Centers for Disease Control and Prevention has issued a Level 3 Warning for Venezuela, explaining that "[t]here has been a breakdown of the medical infrastructure in Venezuela. There are shortages of

food, water, electricity, medicine, and medical supplies that have contributed to an increasing humanitarian crisis affecting much of the country. Adequate health care is currently not available through the public health system in Venezuela." [Trial Ex. 7 at 1].

The United Nations Human Rights Council, which includes 47 countries, found that in Venezuela "[i]n 2018 and 2019, the economic and social crisis deteriorated further as the economy continued to contract, inflation skyrocketed, and public revenues dropped with the drastic reduction in oil exports." [ECF No. 21 at 3]. The Human Rights Council similarly reports that the country's medical system is also failing, "hallmarked by an exodus of doctors and nurses, unsanitary conditions, and severe shortages in basic medical equipment, supplies and medicines. Families of patients have to provide all necessities including water, gloves, and syringes." [Id. at 4]. Over four million people have fled Venezuela, "citing [v]iolations of the rights to food and health [as] the primary drivers. Many seek protection of their right to life with dignity. Other drivers are violence and insecurity, the collapse of basic services, and the deterioration of the education system." [Id. at 13].

Meanwhile, Avendano's witnesses testified to the idyllic nature of Margarita Island. The Court heard testimony from Leah Mundo, the principal of G*'s former school on the island; Lidany Lizarraga, G*'s former dentist; Diego Risquez, G*'s former pediatrician; Densi Wyhnanskyj, one of Avendano's clients; Alejandra Brand, Avendano's employer; and Mirabella Manzana, Avendano's lawyer in Venezuela. [ECF No. 45, 12/12 Tr.; ECF No. 46, 12/13 Tr.]. Each of these witnesses said that Margarita Island is largely insulated from the larger issues in Venezuela, that the schools are functioning, that their hospitals have the necessary medical supplies, that the water is drinkable, and that there are rarely electrical blackouts. [Id.]. They assured the Court that if G* were returned to Margarita Island, he would enroll in the same

school he was in before, which has classes and extracurricular activities, see the same dentist

every six months, and have adequate medical care.  [Id.].  G*'s former pediatrician, who has an

office in Caracas, testified that his hospital remains open and has adequate supplies.  [ECF No.

46, 12/13 Tr., Risquez Testimony].  Avendano's lawyer in Venezuela testified that the courts are

functioning.  [ECF No. 46, 12/13 Tr., Manzana Testimony].

V.     **CONCLUSIONS OF LAW**

    **A.     Legal Standard**

Here, unlike in many cases which implicate the core tenants of the Hague Convention,

G* was not wrongfully removed from Venezuela, nor was he brought to the United States in

search of a friendly legal forum for his father.  Nonetheless, because "[t]he Convention

establishes a strong presumption favoring return of a wrongfully removed child," "[e]xceptions

to the general rule of expedient return . . . are to be construed narrowly."  Danaipour, 286 F.3d at

13–14 (citations omitted).  Balza has the burden of establishing either by a preponderance of the

evidence that the child is mature enough for the Court to consider his stated desire, see 22 U.S.C.

§ 9003(e)(2)(B), or by clear and convincing evidence that returning the child to the country of

habitual residence would pose a "grave risk" to the child's safety, see id. § 9003(e)(2)(A).  Even

if one or both of these exceptions are satisfied, the Court has discretion to order the return of the

child.  Danaipour, 286 F.3d at 14.

    **B.  The Mature Child Exception**

Though the Hague Convention generally favors returning a child to his country of

habitual residence, it provides an exception if a child "objects to being returned and has attained

an age and degree of maturity at which it is appropriate to take account of [his] views."  Hague

Convention, art. 13.  The Convention only applies to children who are younger than sixteen years

old.  Hague Convention, art. 4, T.I.A.S. No. 11,670, at 5.  "[T]he authoritative commentary to the Convention suggests that children who are nearing 16 years should ordinarily have their own wishes respected."  McManus v. McManus, 354 F. Supp. 2d 62, 71 (D. Mass. 2005) (citing Elisa Pérez-Vera, Explanatory Report on the 1980 Child Abduction Convention, ¶ 30, at 433, in 3 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session (1980)).  "The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case by case basis."  Falk v. Sinclair, 692 F. Supp. 2d 147, 159 (D. Me. 2010) (quoting Tsa-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 279 (3d Cir. 2007)).  Thus, the issue is whether G*, who will be twelve years old in March 2020, is sufficiently mature to have his views taken into account and if so, whether his views should carry the day

The mere fact that G* wants to stay in the United States is insufficient to establish that his objection to being returned to Venezuela should be considered.  See, e.g., Gonzalez Locicero v. Nazor Lurashi, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) ("The fact that the child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sports activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.").  Even a mature child for purposes of the statute must both desire to remain in the United States and object to being returned to Venezuela.  See, e.g., Tann v. Bennett, 648 Fed. App'x 146, 149 (2d Cir. 2016) (finding that the twelve-year-old child not only wished to remain in the United States, but objected to being returned to Northern Ireland); Tsui, 499 F.3d at 279 (finding that, though the ten-year-old child expressed a preference for wanting to stay in the United States, she did not include particularized objections to returning to Canada).

In McManus, Judge O'Toole found that four children, an eleven-year-old, a thirteen-year-old, and two fourteen-year-olds, were all mature children under Article 13 of the Convention. McManus, 354 F. Supp. 2d at 65, 71–72. Each child objected to being returned to their country of habitual residence, and Judge O'Toole held that "[t]hey displayed an appropriate understanding of and appreciation for the issues presented in this matter and effectively communicated their experiences and feelings concerning those issues." Id. at 71. In so holding, Judge O'Toole found no indication that the children had been coached or unduly influenced by their father and that "each child was capable of independent thought and was able to appropriately and effectively communicate his or her emotions and desires. Further, . . . each child demonstrated an appropriate appreciation for the implications of his or her expressed desire to remain in the United States, including a certain amount of ambivalence about the decision and its implications." Id. Judge O'Toole acknowledged that the two younger children were not as mature as their older siblings, but nonetheless concluded that "they were able to understand and appreciate the circumstances of the controversy concerning where they should reside and were similarly able to form and express a thoughtful opinion deserving of respect." Id. at 71–72.

Balza has established by a preponderance of the evidence that G* is a mature child, whose desire to stay with his father in the United States should at least be considered. See, e.g., Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 309 (1st Cir. 2019) (affirming district court's finding that a ten-year-old child was mature because she knew the difference between a truth and a lie, had "a good understanding of the decision facing her and specific reasons for her . . . opinion," had not been "coached when she conveyed that she wanted to stay in" the United States and "did not appear to be unduly influenced by the wishes of others"). G* is very clear, consistent, and rational about his desire to remain in the United States with his father. He speaks

very positively about his life in Venezuela. He happily describes his home, with its mango trees and lemon trees, and talks about how much he misses his mother, his dogs, and his extended family. Still, in spite of all of those things, G* has persistently voiced his desire to stay in the United States. See also Díaz-Alarcón, 944 F.3d at 309 n.12 ("Importantly, [the child] had positive and negative things to say about her life [in her country of habitual residence], which showed that it was not a black-and-white decision but rather one that she had weighed and considered. Her [mentioning] positive memories of [her country of habitual residence], including her favorite teacher and beaches, shows a maturity in thought as she decided that those positive memories were outweighed by the negative.").

G* not only prefers to live in the United States, but also objects to being returned to Venezuela. He has a realistic understanding of the situation in Venezuela, knows that there are shortages and hardships, and is aware that people, including some of his friends, are leaving the country. He told the Court that he would feel relieved if he were allowed to stay with his father in the United States and did not have to "worry" about being sent back. [Dec. 11 Interview Tr. at 29–30]. He also said that he did not want to think about what it would be like if he had to move back to Venezuela. [Id.].

G*'s desire to stay in the United States does not appear to be the result of undue influence or coaching by Balza. As noted by Dr. Darsney, G* understands what each of his parents wants and has felt pressure from each of them, but now feels that he is finally representing his own interests. [ECF No. 39, 12/10 Tr., Darsney Testimony]. The *Guardian ad Litem* also found that, though G* was prepared for his meeting with her and had obviously been told about her role and the role of the judge, G* had not been inappropriately coached. [ECF No. 45, 12/12 Tr., Spetter Testimony]. This finding is consistent with Balza's testimony that he had

explained the *Guardian ad Litem*'s role to G* before their meeting.  [ECF No. 40, 12/11 Tr., Balza Testimony].  According to G*, Balza has told him that he can return to Venezuela at any time to visit or to move back permanently, and that Balza would pay for Avendano's travel to the United States to visit him.  [12/11 Interview Tr. at 13, 24].  Regardless of whether Balza would actually be so accommodating, these statements demonstrate that G* feels like he is free to choose for himself whether he wants to stay in the United States or return to Venezuela.[3]  The Court therefore finds that G* is a mature child under Article 13 of the Hague Convention, such that his views about where he wants to live should be taken into account and careful thought should be given before mandating his return to Venezuela over his objection.

## C.     The Grave Risk Exception

The Hague Convention also prohibits repatriation where there "is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b).

> The text of the article requires only that the harm be 'physical or psychological,' but context makes it clear that the harm must be a great deal more than minimal.  Not any harm will do nor may the level of risk of harm be low.  The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be

---

[3] Avendano makes much of Balza's allegedly having told G* that if G* were ordered back to Venezuela and Balza did not return G*, Balza could go to prison.  The Court is unpersuaded by this testimony for three reasons.  First, Avendano has failed to establish that Balza actually said this to G*.  Testimony elicited from Dr. Darsney and Balza, as well as the Court's interview with G* himself, suggest that both Avendano and Balza discussed the legal consequences of failing to return G* to Venezuela.  Second, the child seemed genuinely perplexed when asked if Balza had ever said anything about the possibility of his being sent to jail.  When the Court explained that it was primarily concerned with ensuring that G* was not being manipulated, he explained that he didn't "have any experience with that," but that "now [he] just see[s] it from [his] perspective, and [he] thinks that [he] should stay with [his] dad now."  [12/11 Interview Tr. at 27].  Finally, Avendano misrepresents the context in which Balza allegedly told G* that he could go to prison.  Avendano argues that Balza was telling G* something tantamount to, "If you get sent back to Venezuela, I could go to prison."  If the testimony concerning the statement is to be believed, however, then Balza was telling G*, "If you are ordered back to Venezuela and I do not return you, I could be sent to prison."  Such a quote does not reflect any attempt to manipulate G* and is instead only an explanation of Balza's duty to abide by the Court's decision.

attentive to the purposes of the Convention.  For example, the harm must be 'something greater than would normally be expected on taking a child away from one parent and passing him to another'; otherwise, the goals of the Convention could be easily circumvented.

Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (citations omitted).

It is not relevant who the better parent would be in the long run, and "the Article 13(b) defense may not be used as a 'vehicle to litigate (or relitigate) the child's best interests.'" McManus, 354 F. Supp. 2d at 69 (quoting Danaipour, 286 F.3d at 14).  Similarly, "'elimination of certain educational or economic opportunities' does not constitute a grave risk of harm . . . ." De Aguiar Dias v. De Souza, 212 F. Supp. 3d 259, 270 (D. Mass. 2016) (quoting Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001)).

Courts typically find a "grave risk of harm" when returning the child would result in abuse, neglect, or physical harm at the hands of the other parent.  See, e.g., Díaz-Alarcón, 944 F.3d at 312–13 (considering credible evidence of childhood sexual abuse by a parent); Danaipour, 386 F.3d at 299–300 (affirming district court's finding that returning the child would pose a grave risk of harm when evidence supported a finding of sexual abuse); Whallon v. Lynn, 230 F.3d 450, 460 (1st Cir. 2000) (finding that a father's history of verbal abuse against the child's mother was insufficient to establish that the child would face a grave risk of harm when there was no evidence to suggest that the father had ever abused the child); Walsh, 221 F.3d at 219–21 (finding that Respondent had demonstrated a grave risk of harm when husband had severely beaten his wife over the years in front of the children, including while his wife was pregnant); McManus, 354 F. Supp. 2d at 69–70 (finding no grave risk of harm when mother drank to excess and physically disciplined her children).

A specific risk of harm in a generally dangerous country, however, may be sufficient to establish a grave risk of harm under Article 13.  In De Aguiar Dias, for example, Judge Hillman

found that the respondent had failed to demonstrate that returning the child to Brazil would pose a grave risk of harm, despite testimony that the surrounding area in question was "extremely dangerous and controlled by drug traffickers." 212 F. Supp. 3d at 270. In that case, the child was to be returned to a "calm, middle-class neighborhood, and this testimony was unconverted by Respondent's testimony, which focused on slum neighborhoods 'around'" that area. Id. In Velasquez v. Funes de Velasquez, 102 F. Supp. 3d 796 (E.D. Va. 2015), however, the court found that a child would face a grave risk of harm if returned to El Salvador because it "is one of the most dangerous and violent countries in the world." Id. at 812. In that case, there had been specific threats against the child's father and his family, including that the father's daughter from a previous marriage had been kidnapped and ransomed for multiple days. Id.

The testimony from Alarcón and Gonzalez, as well as reports from the U.S. State Department, U.S. Centers for Disease Control, and the United Nations Human Rights Council all describe a country that is experiencing high rates of "crime, civil unrest, poor health infrastructure, kidnapping, and arbitrary arrest and detention," such that it is unsafe for U.S. citizens to travel there. [Trial Ex. 3 at 1 (emphasis in original)]. The State Department's Level 4 advisory, coupled with "shortages of food, water, electricity, medicine, and medical supplies," [Trial Ex. 7 at 1], makes the situation in Venezuela analogous to countries experiencing war, famine, or disease, such as Syria, Somalia, Afghanistan, and Iraq, [Trial Ex. 5 at 1–2].

The First Circuit recently found that the conditions in Venezuela have worsened in a manner sufficient to support an asylum claim. Cabas v. Barr, 928 F.3d 177, 182 (1st Cir. 2019). The panel found that "[t]he Venezuelan government's increasingly aggressive, increasingly violent repression of political dissent and its shift towards authoritarian rule certainly made it more likely that a political dissident would face persecution upon returning to Venezuela . . . ."

Id.[4]  In reaching that conclusion, the panel considered the 2016 U.S. State Department's Human

Rights Report for Venezuela.  Id.  That report "reveals a material shift in Venezuela's political

landscape and a significant escalation in the dangers that opposition political activists face in that

country."  Id. at 181.  The reported dangers include over 5,853 arbitrary detentions from 2014 to

2016, over 100 political prisoners and an additional 1,998 individuals subjected to restricted

movement based on political activity, and 1,296 extrajudicial killings in 2016.  Id. at 182.

Finally, in some parts of the country, "the regime has suspended the constitutional rights to meet

publicly and privately without prior government permission and to peacefully demonstrate."  Id.

More specific to G* and Margarita Island, when asked what he liked best about living in

the United States as opposed to Venezuela, G* said that there were no problems with access to

food here and that there were a lot of people living on the streets in Venezuela.  [12/11 Interview

_____

[4] At least one district court has found that Venezuela's current political and socioeconomic
climate is insufficient to establish a grave risk of serious harm under Article 13.  In Crespo
Rivero v. Carolina Godoy, No. 18-cv-23087, 2018 WL 7577757, at *4 (S.D. Fla. Oct. 12, 2018),
the district court found that "Venezuela's current political unrest does not rise to the level of
'zone of war, famine, or disease.'"  The First Circuit has addressed, but has not adopted the
"zone of war, famine, or disease" standard for the grave risk exception.  See Walsh, 221 F.3d at
221 (discussing the "zone of war, famine, or disease" standard adopted by the Sixth Circuit
(quoting Friedrich v. Friedrich, 78 F.3d 1060, 1069 (6th Cir. 1996))); see also Krefter v. Wills,
623 F. Supp. 2d 125, 136 (D. Mass. 2009) (noting that other courts have found that "the grave
risk exception only applies when the child is in 'danger prior to the resolution of the custody
dispute—e.g., returning the child to a zone of war, famine, or disease . . . [or when] there is a
grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence."
(quoting Friedrich, 78 F.3d at 1069)).  Other district courts in this circuit have found that "[t]he
situation contemplated by Article 13(b) would include sending a child back to a 'zone of war,
famine, or disease' as well as 'cases of serious abuse or neglect, or extraordinary emotional
dependence, when the court in the country of habitual residence, for whatever reason, may be
incapable or unwilling to give the child adequate protection.'"  Patrick v. Rivera-Lopez, No. 12-
cv-1501, 2013 WL 708947, at *12 (D.P.R. Feb. 26, 2013); see also Gonzalez v. Nazor Lurashi,
No. 04-cv-1276, 2004 WL 1202729, at *6 (D.P.R. May 20, 2004) (explaining the Sixth Circuit
standard).  Because the Court finds that G* is a mature child whose desire to remain in the
United States should be considered, it need not determine which standard should apply to the
grave risk exception.

Tr. at 21]. When asked whether he thought that things were better or worse on Margarita Island than in the rest of the country, he said that, "All of Venezuela has problems . . . ." [Id. at 22].

In any event, having determined that G* is a mature child who objects to being returned to Venezuela, the Court need not decide if "the grave risk exception" is applicable. See 22 U.S.C. § 9003(e)(2)(B). The Court does find, however, that current living conditions in Venezuela are relevant in explaining why G* would like to remain with his father in the United States and, in that context, will be considered by the Court in determining whether his wishes should be honored.

VI.     **CONCLUSION**

Accordingly, though Balza's retention of the child was wrongful under the Convention, as established by Avendano's *prima facie* case, the Court exercises its discretion granted by Article 13 of the Convention and refuses Avendano's petition for return of the child to Venezuela. Balza has established by a preponderance of the evidence that G* is a mature child such that the Court should consider his stated desire to remain with his father in the United States.

G* has two parents who love him very much but disagree about what would be best for him. Nothing in the Court's decision should be taken as commentary about which parent has a better relationship with their son, loves him more, or would be the better parent. G* is lucky enough to have two caring and devoted parents. The Court's decision is limited to the determination that G* is a mature child, who has decided that he wants to stay in the United States. Although he loves Venezuela and his mother, G* recognizes the unrest in his home country and does not want to live there. This is not an irrational decision. It is therefore up to the courts of this country to determine how best to navigate any custody decisions.

G* loves both of his parents.  Though he once hoped that his parents would get together again, he has now accepted that as an impossibility, and just wants his parents to support him and his decisions.  More than anything, G* wants his parents to get along so that he can have a loving relationship with each of them and travel freely between the U.S. and Venezuela.  The Court has determined only that G* is sufficiently mature for his views to be considered.  The Court's decision is not made solely based on his wishes, although this weighs heavily, but also in light of the situation in Venezuela.  The Court is also influenced by how unwavering G* has been in his desire to remain here and his father's seeming willingness to allow him access to his mother.  Given two loving parents and their smart, interesting, and personable child, the Court fervently hopes that Balza and Avendano can put their love for their child over their dislike of each other, and find a way for G* to spend time with both parents, without fear or anxiety and to allow G* to enjoy the remainder of his childhood without the stress of being embroiled in the ongoing parental conflict.

**SO ORDERED.**

February 25, 2020                                                              /s/ Allison D. Burroughs
                                                                                        ALLISON D. BURROUGHS
                                                                                        U.S. DISTRICT JUDGE